# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JAMES BUECHLER and JESSE MARTINEZ,
on behalf of themselves and all others similarly
situated,

               Plaintiffs,

v.

RUMBLE INC.,

               Defendant.

Case No.: 8:22-cv-02237

**CLASS ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs James Buechler and Jesse Martinez ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this action against Defendant Rumble Inc. ("Rumble" or "Defendant"). Plaintiffs make these allegations on personal knowledge as to themselves and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs bring this consumer privacy class action on behalf of subscribers to Rumble's video streaming services who obtained video content from its website and applications and had a Facebook account during the time Rumble used Facebook Pixel. Defendant's systematic practice of knowingly disclosing its subscribers' personally identifiable information ("PII") to third-party Facebook, Inc. (now known as Meta Platforms, Inc.) without their informed, written consent violates the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "Act").

2.     Defendant is an online video platform that provides subscribers with a wide array of live and on-demand video content in the areas of news, sports, finance, entertainment, music, and cooking on its website and mobile application. Defendant's subscriber base has skyrocketed over the past two years due to its addition of video content from and endorsement by various popular conservative commentators, politicians and celebrities and its efforts. While Defendant has publicly

contrasted its "neutral video platform" from the highly "partisan" and "censored" "Big Tech" media platforms like Facebook, it uses Facebook's tracking tool behind the scenes to systematically collect and transmit its own subscribers' PII to Facebook to increase its bottom line.

3.      Congress enacted the VPPA in 1988 to give consumers "control over personal information divulged" in exchange for "services from video tape service providers," S. Rep. No. 100-599, at 8, by prohibiting these providers from "knowingly disclosing" "personally identifiable information concerning any consumer." This includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," without the consumer's specific and informed prior written consent. Defendant violated each element of this Act.

4.      Plaintiffs and the other members of the Class (defined below) are "consumers" because they are subscribers to Rumble's website. And Defendant is a "video tape service provider" because it operates a digital video streaming service that provides its subscribers with access to video content through its websites and applications.

5.      Defendant knowingly discloses its subscribers' "personally identifiable information" ("PII") to Facebook through its use of the "Facebook Pixel" or "Pixel," a programming code that Facebook makes available to Rumble to collect granular information about its subscribers' interactions with its websites. Facebook uses this information to build detailed profiles about Rumble's subscribers that enables Rumble to serve them with targeted advertisements on Facebook and otherwise facilitates Rumble's use of Facebook's advertising services.

6.      Defendant intentionally installed the Pixel and selected the specific user information the Pixel would collect from its subscribers and send to Facebook, including specific videos the user accessed (via the video's title and the URL for the video) and the user's unencrypted and personally and publicly identifiable Facebook ID ("FID").

7.     The FID is a unique sequence of numbers linked to an individual's Facebook profile that identifies the individual more precisely than a name or email address. Indeed, entering "facebook.com/[FID]" into any web browser returns the Facebook profile of the specific individual. Because a user's FID uniquely and personally identifies that person's Facebook account, an unencrypted FID allows any ordinary person to quickly and easily use an unencrypted FID to locate, access, and view a particular user's Facebook profile, and all of the detailed and personal information contained in it.

8.     Rumble thus discloses to Facebook through the Pixel in one transmission the following information each time a subscriber accesses a video on its websites or applications: (1) the video's title and URL; and (2) detailed, personal information that easily identifies the subscriber via the FID. This information constitutes PII under the VPPA.

9.     Finally, Defendant did not obtain—or even seek—the separate, informed written consent needed for it to lawfully disclose the PII of Plaintiffs or any other Class member.

10.     Accordingly, Plaintiffs and all similarly situated subscribers are "aggrieved persons" under the VPPA seeking an order enjoining Defendant from further unauthorized disclosures of PII; awarding actual damages no less than liquidated damages of $2,500 per violation, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest as permitted by law; and any other relief the Court deems appropriate.

## PARTIES

11.     Plaintiff James Buechler ("Buechler") is a citizen and resident of Maryland.

12.     During the two years before Plaintiffs filed this action, Buechler has had a Facebook account, subscribed to Defendant's digital video streaming device, and used a laptop, desktop computer, and smart phone to access streaming video content on that service.

13.     Plaintiff Jesse Martinez ("Martinez") is a citizen and resident of New Mexico.

14.     During the two years before Plaintiffs filed this action, Martinez has had a Facebook account, subscribed to Defendant's digital video streaming device, and used a desktop computer and smart phone to access streaming video content on that service.

15.     Defendant Rumble Inc., doing business as Rumble, is a Delaware corporation with its principal place of business located at 444 Gulf of Mexico Drive, Longboat Key, FL 34228.

16.     Founded in 2013, Defendant owns and operates an online digital streaming service that offers a wide range of video content in the news, commentary, sports, entertainment, music, and cooking arenas. Defendant's video streaming content is available on its website (www.rumble.com) and mobile application.

17.     Defendant's video streaming service has experienced a significant increase in popularity and number of subscribers within the last two years. This change in fortune coincided with the company receiving financial backing from billionaire venture capitalist Peter Thiel, reinventing itself as a conservative version of YouTube, and offering an increasing amount of video content from popular conservative commentators, politicians, and celebrities.

18.     Defendant became a public company, and its common shares and warrants began trading on the NASDAQ stock exchange, on September 19, 2022. Defendant's initial public offering followed the September 16, 2022 completion of its merger with publicly traded special purpose acquisition company CF Acquisition Corp. VI. Pursuant to the transaction, Defendant received approximately $400 million in gross proceeds, about $300 million of which was cash held in a trust account. Defendant's Founder and Chief Executive Officer, Chris Pavloski, reported at the time that it retained nearly all of the cash in trust, with almost no redemptions from CFVI shareholders. Defendant's reported market capitalization as of September 29, 2022 was about $3.29 billion.

**JURISDICTION AND VENUE**

19.     This Court has personal jurisdiction over Defendant because its principal place of business is in Florida.

20.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

21.     Venue is appropriate in this Court because Defendant resides in this District, and certain of the conduct alleged in this lawsuit occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      The Video Privacy Protection Act**

22.     With certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without first obtaining the consumer's informed, written consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710.

23.     Congress passed the VPPA to protect the privacy of individuals' video rental, purchase, and viewing information, so that consumers can "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599 at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.* at 7-8.

24.     The need for the protections of the VPPA are more pronounced today than ever given the largely unregulated, sprawling, and lucrative market for consumers' online personal data, including their video watching habits. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized this point: "While it is true that technology has changed over the years, we must stay faithful to our

fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

25. Defendant knowingly deprived Plaintiffs and the proposed Class members of this important right for its own profit by systematically disclosing their PII to Facebook in violation of the Act.

## II. Plaintiffs and the Other Class Members Subscribe to Defendant's Services.

26. Defendant owns and operates the Rumble website and mobile application, which is available on both iOS and Android-based devices.

27. The Rumble website and mobile application provide streaming video content to subscribers, as illustrated by the following screen shot of a recently published main page:



28. An individual must "subscribe" to Rumble and "sign in" to its website in order to fully interact with and enjoy all of the features and benefits associated with its video offerings.

29. To "subscribe" to Rumble, an individual may turn to the "Sign In" button located at the top of the website (highlighted below):



30.     During the sign in process, individuals must provide to Defendant certain personal information, including personally identifiable information such as their name, email address, and country. Individuals are also prompted to provide additional personally identifiable information such as their address, phone number, and birthday.

31.     Individuals also can subscribe to Rumble by "alternatively" "sign[ing] in with" Facebook, Google, or Apple, as shown below.



32.     Subscribing to Rumble through any of these services, as detailed below, gives Rumble access to the individual's name, profile picture, email address and birthday, among other personally identifiable information.

33.     An individual who "sign[s] in with Facebook" must click on the corresponding Facebook button, which causes a screen to appear allowing that individual to enter their email address

or phone number and Facebook password. Afterwards, another screen appears stating that "Rumble is requesting access to" the individual's "name and profile picture and email address" above a "Continue" button that the individual may click to access Rumble's service. "By continuing," the individual is informed that "Rumble will receive ongoing access to the information you share and Facebook will record when Rumble accesses it." After clicking "Continue," the individual is taken back to the Rumble website and asked to "enter your preferred username for Rumble and the email address associated with your Facebook account" as well as birthday. After finishing this final step, the individual has successfully created an account and subscribed to Defendant's service.

34.     An individual who signs in with Google or Apple must go through the same process described above. In creating a Rumble account with Google, the individual is informed that "Google will share your name, email address, language preference, and profile picture with rumble.com." In creating a Rumble account with Apple, the individual is informed that this will be done "using your Apple ID" email address and name. Whichever one of these services is used, once the individual clicks "Continue," that person is taken back to the Rumble website and asked to "enter your preferred username for Rumble and the email address associated with your [ ] account" as well as birthday. After finishing this last step, the individual has successfully created an account and subscribed to Defendant's service.

35.     After an individual subscribes to Rumble, that person can utilize various features and benefits of the service that non-subscribers cannot.

36.     For example, a Rumble subscriber can subscribe to any of Defendant's numerous "Featured Channels." These Featured Channels contain videos from news outlets such as Reuters, from conservative and right-wing media personalities like Sean Hannity, and from popular actors and content creators including Russell Brand.

37.    A person wishing to access video content on any Featured Channel must click on the "SUBSCRIBE" button for that channel (highlighted below). Anyone doing so who is not a Rumble subscriber will be required to create an account and sign in to access the respective Rumble video channel.



38.    A Rumble subscriber also is able to view, like, and post comments associated with the respective video (highlighted below):



39.     Additionally, to access *any* video content through the Rumble mobile application, an individual must be a Rumble subscriber and sign in with the necessary login information before accessing the desired video content using the following interface:



40.     Defendant's subscribers are therefore consumers under the VPPA.

### III.   Defendant is a "Video Tape Services Provider" Because it Streams Video Content.

41.     Defendant provides video tape services to its subscribers by offering an array of video content on the website and mobile application that it owns and operates.

42.     Defendant provides streaming video content to subscribers on a wide variety of topics, including politics, finance, comedy, sports, science, gaming, cooking, and music, and through numerous popular channels.

43.     As one recent article notes, "Rumble is a website for exchanging videos" where "you "can watch, like and comment on videos while subscribing to channels you love. You'll find Reuters, Russell Brand, and America's Funniest Videos (AFV) among its featured channels. You can see

trending and live content and what editors pick. Otherwise, just enter your topic of interest to get dozens of related videos in the search box."

44.     Defendant characterized itself in a recent securities filing leading up to its IPO as a "high-growth neutral video platform" that is "designed to be immune to cancel culture."

45.     Defendant's December 2021 investor presentation touted the "sustainable competitive advantage" of its' "'neutral' video platform" while noting that "[t]he trust in Big Tech has materially diminished." The presentation noted Defendant's rise in viewership coincided with the "Acceleration of Big Tech Censorship" and illustrated how the "high partisanship" and "high censorship" from the major "Big Tech" companies, including Facebook and its wholly owned subsidiary Instagram, set Defendant apart from the rest and "created significant market opportunity":



46.     Similarly, Defendant markets itself to subscribers "as an alternative to platforms like YouTube and Vimeo" "where you get to see creators at their best, unshackled from algorithms and subjective editorial control."

47.     News articles describe Defendant's video services similarly, with one reporting that "Rumble is a video platform that lets you watch and create content with fewer restrictions."

48.     Defendant offers an expanding array of conservative and right-leaning video content and corresponding channels that have driven subscriber growth, including Dan Bongino, Devin Nunes, Charlie Kirk, Donald Trump, Donald Trump Jr., and Laura Ingraham. For instance, The Dan Bongino Show channel on Defendant's website alone now has over 2.4 million subscribers, and Donald Trump's channel on its website currently has around 1.4 million subscribers.

49.     In 2018, Quantcast ranked Defendant as a Top 10 Mobile Site. In 2021, Defendant accrued 8 billion minutes watched per month. In an Investor Presentation from December 2021, Defendant described its meteoric growth rate from one million monthly active users in 2018 to 36 million active users in 2021 as "similar to TikTok." As of September 15, 2022, only a few days before its IPO, Defendant announced that it had hit a record 44 million average monthly users.

50.     Defendant is thus a prototypical video tape service provider under the VPPA.

**IV.  Defendant Knowingly Discloses Subscribers' PII to Facebook Whenever They Access Videos on its Website.**

51.     Defendant knowingly discloses Plaintiffs' and other Class members' PII to Facebook through the Pixel code it embedded on its website.

52.     The Facebook Pixel, first introduced in 2013, allows online businesses like Rumble to build detailed profiles about its users by collecting information about how they interact with their websites, thereby facilitating the service of targeted advertising. The Pixel commonly relays what items users view, and, as relevant here, the exact content accessed on a particular webpage, including specific video materials. The Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

53.     Defendant collects, uses, and shares subscribers' personal information obtained through its websites for various marketing and advertising purposes, as demonstrated generally by provisions in its Privacy Policy.

54.     Defendant's Privacy Policy states that when a subscriber registers with Rumble, Rumble "will ask you for certain information about you that can be used to contact or identify you ('Personal Information')" including "your name, gender, profile photo, free-form biography, location/hometown, website and email address." The Policy further states, as corroborated above, that if a subscriber chooses to register by logging into a third-party social networking service ('SNS'), it collects "the Personal Information you have already provide to the SNS (such as your 'real' name, email address and other information you make publicly available via the SNS)."

55.     The Policy states that when subscribers "visit the Service," "our servers automatically record information that your browser sends whenever you visit a website," including "information such as the browser type or the webpage you were visiting before you came to our Service, pages of our Service that you visit, the time spent on those pages, information you search for on our Service, access times and dates, and other statistics." It also states that Defendant "use[s] this information" to, among other things, "recognize you" and "serve advertisements and other information appropriate to your interests."

56.     The Policy also states that Defendant "may employ third party companies and individuals to facilitate our Service, to provide the Service on our behalf, to perform Service-related services (*e.g.*, maintenance services, database management, web analytics, and improvements of the Service's features) or to assist us in analyzing how our Service are used" and that "[t]hese third parties have access to your Personal Information only to perform these tasks on our behalf."

57.     Finally, the Policy states that Defendant "may share the information in your Rumble account (including your Personal Information) with the SNSs that you linked to your Rumble account."

58.    One important tracking technology that Defendant uses to further its advertising goals—but does not disclose or discuss in its Terms of Use, Privacy Policy or any other material provided to subscribers—is the Facebook Pixel.

59.    The Pixel is a unique string of code that businesses install on their websites. It places and triggers specific cookies of the businesses' choosing that track users' Internet activity and utilizes that information to build detailed user profiles. The Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

60.    Facebook promotes the Pixel to companies like Defendant as a "powerful tool" that can "help power [its] Facebook ads . . . [to] reach a more relevant audience, provide a more personalized ad experience and optimize [its] ad campaigns towards better business outcomes." Facebook also profits from the Pixel. While Facebook does not charge businesses to install the Pixel on their websites, it charges them to place the advertising that the Pixel makes possible on Facebook's platform. The Pixel is an important piece of Facebook's advertising business, which comprises 97% of the company's annual revenue and has made it the world's leading social media marketing platform. As shown below, Facebook's advertising revenues have increased significantly year after year since 2015, culminating in nearly $115 billion in worldwide revenue in 2021:



61.    To take advantage of Facebook's targeted advertising and analytical services, Defendant intentionally installed the Pixel on its websites via step-by-step instructions provided on Facebook's website.

62.    During the installation process, Defendant chose certain of a menu of available "Events" for incorporation into the Pixel installed on its website. The Pixel's Events track specific information about the activity of users when they visit a company's website. One of the Events that Defendant chose for its Pixel is "PageView." PageView captures and shares the URL and title of each video a subscriber accesses on its site, as shown in the below Pixel Helper Extension exemplar:



63.    Defendant also knew that the Pixel installed on its website would send Facebook cookies identifying their subscribers, including unencrypted FIDs. This is shown by, among other things, Defendant's familiarity with and use of identifying cookies on its website in connection with its targeted advertising efforts, the admissions on these general types of practices noted in its Privacy Policy, and its knowledge of how the Pixel worked, *i.e.*, that the Pixel's sharing of information with Facebook enabled Defendant to show targeted advertising to its digital subscribers based on the video content those subscribers viewed on the website.

64.     Defendant's knowledge of how the Pixel installed on its website operates and what subscriber information it sends to Facebook is further demonstrated by the company's familiarity with and reliance on targetted consumer advertising to make money.

65.     In a December 2021 investor presentation, Defendant noted that a "key revenue driver" is the "monetization" that it receives from "advertising" and two other sources. Furthermore, the presentation's summary of risk factors noted that "Rumble collects, stores, and processes large amounts of user video content and personal information of its users and subscribers," that "Rumble may fail to comply with applicable privacy laws," and that breach of its security measures could result in "traffic and advertisers" curtailing or ceasing use of its services.

66.     In January 2022, moreover, Defendant announced that it would begin rolling out its own advertising platform that would significantly increase its revenue stream and, according to its CEO, challenge the market leading Google AdSense platform. In the same release, Defendant noted that its proprietary platform would provide "extensive targeting."

67.     An FID is a unique, personal, and persistent identifier Facebook assigns to each of its users that allows anyone to look up the user's Facebook profile to learn that person's identity. If the FID is combined with a video title watched by that Facebook user—all of which Defendant knowingly provides to Facebook through the Pixel embedded on its websites—any ordinary person could identity a subscriber and the specific video materials that subscriber accessed on Defendant's sites.

68.     Defendant disclosed to Facebook the video title and FID of a Rumble subscriber in a single transmission via the Facebook Pixel. This transmission occurred regardless of whether the Facebook tab was open or closed. This transmission is depicted in the following exemplar screenshot:



69.     In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. The highlighted information in Box A shows the URL for a video titled "New research claims potential 'unlimited clean energy'" that was accessed on www.rumble.com. Box B identifies the subscribers' unencrypted FID as the number after the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons).

70.     The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that the Pixel sent the same specific types of PII to Facebook:

71.     In this table, Box A shows that the subscriber accessed the URL of http://rumble.com/v1ktzt7-new-research-claims-potential-unlimited-clean-energy.html.    Box    B shows that the "title" of the video is "New research claims potential 'unlimited clean energy'" and provides a short description of the video. Box C contains two separate entries that each identify the material as a "video" and also provide its title, URL and a brief description.  The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

72.     Entering the URL identified in the above graphics on a browser pulls up the video.

73.     An ordinary person could identify the subscriber accessing this video by entering the unencrypted FID associated with the c_user cookie on their search bar as follows: https://www.facebook.com/[unencrypted FID]/. Doing so reveals the subscriber's Facebook profile that identifies the subscriber. This basic method of accessing a person's Facebook profile is generally and widely known among the public.

74.     An exemplar Facebook profile of the type one would see after entering a subscriber's unencrypted FID follows:



75.     Accordingly, Defendant violates the VPPA by knowingly disclosing its subscribers' FIDs alongside the specific accessed videos to Facebook.

**V.     Defendant Discloses Subscribers' PII to Facebook Without Consent.**

76.      Defendant does not request or receive separate, informed written consent when disclosing Plaintiffs' or Class members' PII to Facebook, even though Defendant must obtain informed, written consent "in a form distinct from any form setting forth" the consumers' "other legal or financial obligations.  *See* 18 U.S.C. § 2710(b)(2).

77.     Instead, Defendant provides links to its Terms of Use and Privacy Policy, which subscribers need not click or read during the registration process.

78.     Defendant's Privacy Policy, quoted above, contains only general statements that it uses tracking technologies to collect and share certain personally identifiable subscriber information with third parties in certain circumstances for advertising purposes. Defendant's Terms of Use provides even less information about subscribers' personal information and how Defendant may use it. Neither document discloses that Defendant collects and transmits the specific subscriber PII at issue herein to Facebook.

79.     Even if Defendant's Terms of Use or Privacy Policy contained the informed, written consent required under the VPPA (which it does not), it is not in a form separate and distinct from consumers' other legal and financial obligations.

80.     Moreover, Defendant does not obtain informed, written consent when it seeks to disclose consumers' PII or in advance for a set period of time, not to exceed two years, or until consent is withdrawn by the consumer, whichever is sooner.

81.     Defendant also does not provide consumers like Plaintiffs with the opportunity – in a clear and conspicuous manner – to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures at the consumers' election.

82.     Indeed, Defendant acknowledged in a December 2021 Investor Presentation that "Rumble collects, stores and processes large amounts of user video content and personal information of its users and subscribers" and recognized the risk that "Rumble may fail to comply with applicable privacy laws."

83.     Defendant violates the VPPA by knowingly disclosing its subscribers' PII to Facebook without consent.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

84.     Plaintiff James Buechler ("Buechler") has had a Rumble subscription during the past two years and has had a Facebook account since 2000. Plaintiff Jesse Martinez ("Martinez") has had a Rumble subscription during the past two years and has had a Facebook account since 2010.

85.     During at least the two years before this action was filed, Buechler has used an Internet-connected laptop, desktop computer, and smart phone to access video content using his Rumble subscription on Defendant's website. During at least the two years before this action was filed, Martinez used an internet-connected desktop computer and smart phone to access video content using his Rumble subscription on Defendant's website.

86.     On information and belief, Defendant disclosed to Facebook Plaintiffs' unencrypted FIDs along with the titles and URLs of the videos they accessed on Defendant's website within the past two years on one or more occasions.

87.     Defendant did not seek or obtain Plaintiffs' informed, written consent for any of the aforementioned disclosures, including in a separate and distinct form from any other document setting forth any other legal or financial obligations Plaintiffs had to Defendant.

88.     Each time Defendant disclosed Plaintiffs' PII to Facebook, it violated their rights under the VPPA.

## CLASS ALLEGATIONS

89. Plaintiffs bring this lawsuit under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who subscribed to Rumble and accessed video content on Rumble's website (www.rumble.com) or app while having a Facebook account.

90. The Class Period is from September 29, 2020 to the present.

91. Excluded from the Class is Defendant, any control person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person.

92. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon information obtained in discovery or through further investigation.

93. **Numerosity**: The Class consists of millions of ascertainable individuals, making joinder impractical.

94. **Commonality and Predominance**: Common questions of law and fact exist concerning the Class's claim and predominate over any questions affecting only individual Class members. Questions common to the Class include:

   a. Whether Plaintiffs and the Class members are "consumers;"

   b. Whether Defendant is a "video tape service provider;"

   c. Whether the information Defendant disclosed to Facebook constitutes "personally identifiable information;"

   d. Whether Defendant "knowingly disclosed" Plaintiffs' and the Class members' PII to Facebook;

e.   Whether Defendant obtained "the informed, written consent" of Plaintiffs and the Class members "in a form distinct and separate from any form setting forth other legal or financial obligations" of those individuals;

f.   Whether Defendant "provided an opportunity, in a clear and conspicuous manner," for Plaintiffs and the Class members "to withdraw on a case-by-case basis or to withdraw from ongoing disclosures," at their "election;"

g.   Whether Plaintiffs and the Class members are "aggrieved persons;"

h.   Whether Defendant's conduct violates the VPPA;

i.   Whether Defendant should be enjoined from disclosing Plaintiffs' and the Class members' PII; and

j.   The extent and form of any other preliminary or equitable relief that the Court determines appropriate.

95.   **Typicality:** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class members, have been injured in the same way by Defendant's misconduct—disclosing consumers' PII to Facebook—and seek the same legal relief to remedy this misconduct.

96.   **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including data privacy cases. Plaintiffs do not have any interests antagonistic to those of the Class.

97.   **Ascertainability**: The members of the Class can be readily determined through objective criteria and the utilization of data in the possession of Defendant or third-party Facebook that will identify Defendant's subscribers whose privacy rights as set forth in the VPPA were violated due to Defendant's misconduct as alleged herein.

98.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages and injunctive relief are essential to induce Defendant to comply with federal privacy law. Moreover, Class members are very unlikely to pursue legal redress individually for the violations detailed herein because the amount of each Class member's claim is prohibitively small relative to the complexity of the litigation, the resources necessary to effectively prosecute this action, and Defendant's significant resources. A class action will allow these claims to be brought where they would otherwise go unaddressed because of the prohibitive costs of bringing individual lawsuits. Finally, a class action would provide the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSE OF ACTION

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

99.   Plaintiffs incorporate and reallege the above factual allegations by reference.

100.   The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

101.   As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class members are subscribers to Defendant's services that provide video content. Thus, Plaintiffs and Class members are "consumers" under this definition.

102.   As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" because it provides online video streaming services to its subscribers.

103.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Defendant disclosed Plaintiffs' and Class members' "personally identifiable information"—specifically, their unencrypted FIDs and the title and URL of the videos they requested or obtained—to Facebook.

104.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiffs and each Class member to Facebook as an individual who accessed Defendant's video content, including the specific video materials requested or obtained on Defendant's website. Indeed, anyone with an FID could identify the individual associated with it simply by entering "facebook.com/[FID]" into a web browser.

105.     Pursuant to 18 U.S.C. § 2710(b)(1), Defendant "knowingly" disclosed the PII of Plaintiffs and the Class members because it intentionally programmed the Facebook Pixel into its website code while knowing that Facebook would receive video titles and the consumer's FID when a consumer requested or obtained a specific video.

106.     Defendant never obtained from Plaintiffs or any Class member the separate and informed written consent needed to lawfully disclose their PII to a third-party pursuant to 18 U.S.C. § 2710(b)(2). More specifically, Defendant never obtained from Plaintiffs or any Class member informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiffs or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiffs or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election.

107. By disclosing Plaintiffs' and Class members' PII, Defendant violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching activity, and Plaintiffs and Class members are each "aggrieved persons" entitled to relief under 18 U.S.C. § 2710(c).

108. As a result of these violations, Defendant is liable to Plaintiffs and Class members.

109. On behalf of themselves and all members of the Class, pursuant to 18 U.S.C. § 2710(c)(2)(A), Plaintiffs seek to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; punitive damages; reasonable attorneys' fees and costs; pre- and post-judgment interest as allowed by law; and all other preliminary or equitable relief the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

i. Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

ii. Enter judgment in favor of Plaintiffs and the Class;

iii. Enjoin Defendant's future disclosures of Plaintiffs' and Class members' PII;

iv. Award Plaintiffs and Class members actual damages but not less than liquidated damages in an amount of $2,500 per violation;

v. Award Plaintiffs and Class members punitive damages;

vi. Award Plaintiffs and Class members reasonable attorneys' fees and other litigation costs reasonably incurred;

vii. Award Plaintiffs and Class members pre- and post-judgment interest as provided by law; and

viii. Award such other preliminary and equitable relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: September 29, 2022

Respectfully submitted,

Nicomedes Sy Herrera (FL Bar No. 1029853)
HERRERA KENNEDY LLP
1300 Clay Street, Suite 600
Oakland, CA 94612
Tel: (510) 422-4701
nherrera@herrerakennedy.com

Shawn M. Kennedy
HERRERA KENNEDY LLP
4590 MacArthur Blvd., Suite 500
Newport Beach, CA 92660
Tel: (949) 936-0900
skennedy@herrerakennedy.com

Christopher J. Cormier
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

Hannah Crowe
Lauren Cross
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
hcrowe@burnscharest.com
lcross@burnscharest.com

*Attorneys for Plaintiffs and the Proposed Class*